1  PAT LUNDVALL (NSBN 3761)
   KRISTEN T. GALLAGHER (NSBN 9561)
2  AMANDA M. PERACH (NSBN 12399)
   McDONALD CARANO LLP
3  2300 West Sahara Avenue, Suite 1200
   Las Vegas, Nevada 89102
4  Telephone: (702) 873-4100
   plundvall@mcdonaldcarano.com
5  kgallagher@mcdonaldcarano.com
   aperach@mcdonaldcarano.com
6
   *Attorneys for Plaintiffs Fremont Emergency*
7  *Services (Mandavia), Ltd., Team Physicians*
   *of Nevada-Mandavia, P.C. & Crum, Stefanko and*
8  *Jones, Ltd. dba Ruby Crest Emergency Medicine*

9              **UNITED STATES DISTRICT COURT**

10                    **DISTRICT OF NEVADA**

11 FREMONT EMERGENCY SERVICES                    Case No.: 2:19-cv-00832-JAD-VCF
   (MANDAVIA), LTD., a Nevada professional
12 corporation; TEAM PHYSICIANS OF NEVADA-
   MANDAVIA, P.C., a Nevada professional
13 corporation; CRUM, STEFANKO AND JONES,
   LTD. dba RUBY CREST EMERGENCY                 **FIRST AMENDED COMPLAINT**
14 MEDICINE, a Nevada professional corporation,
                                                 **Jury Trial Demanded**
15                            Plaintiffs,

16 vs.

17 UNITEDHEALTH GROUP, INC., a Delaware
   corporation; UNITED HEALTHCARE
18 INSURANCE COMPANY, a Connecticut
   corporation; UNITED HEALTH CARE
19 SERVICES INC., dba UNITEDHEALTHCARE, a
   Minnesota corporation; UMR, INC., dba UNITED
20 MEDICAL RESOURCES, a Delaware
   corporation; OXFORD HEALTH PLANS, INC., a
21 Delaware corporation; SIERRA HEALTH AND
   LIFE INSURANCE COMPANY, INC., a Nevada
22 corporation; SIERRA HEALTH-CARE
   OPTIONS, INC., a Nevada corporation; HEALTH
23 PLAN OF NEVADA, INC., a Nevada corporation;
   DOES 1-10; ROE ENTITIES 11-20,
24
                            Defendants.
25

26        Plaintiffs Fremont Emergency Services (Mandavia), Ltd. ("Fremont"); Team Physicians

27 of Nevada-Mandavia, P.C. ("Team Physicians"); Crum, Stefanko and Jones, Ltd. dba Ruby

28 Crest Emergency Medicine ("Ruby Crest" and collectively the "Health Care Providers") as and

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966
McDONALD CARANO

for their First Amended Complaint against defendants UnitedHealth Group, Inc. ("UHG"), and its subsidiaries and/or affiliates United Healthcare Insurance Company ("UHCIC") United Health Care Services Inc. dba UnitedHealthcare ("UHC Services"); UMR, Inc. dba United Medical Resources ("UMR"); Oxford Benefit Management, Inc. ("Oxford" together with UHG, UHC Services and UMR, the "UHC Affiliates" and with UHCIC, the "UH Parties"); Sierra Health and Life Insurance Company, Inc. ("Sierra Health"); Sierra Health-Care Options, Inc. ("Sierra Options" and together with Sierra Health, the "Sierra Affiliates"); Health Plan of Nevada, Inc. ("HPN") (collectively "Defendants") hereby complain and allege as follows:

**NATURE OF THIS ACTION**

1.     This action arises out of a dispute concerning the rate at which Defendants reimburse the Health Care Providers for the emergency medicine services they have already provided, and continue to provide, to patients covered under the health plans underwritten, operated, and/or administered by Defendants (the "Health Plans") (Health Plan beneficiaries for whom the Health Care Providers performed covered services that were not reimbursed correctly shall be referred to as "Patients" or "Members").[1]  Collectively, Defendants have manipulated, are continuing to manipulate, and have conspired to manipulate their third party payment rates to defraud the Health Care Providers, to deny them reasonable payment for their services which the law requires, and to coerce or extort the Health Care Providers into contracts that only provide for manipulated rates.  Defendants have reaped millions of dollars from their illegal, coercive, unfair, fraudulent conduct and will reap millions more if their conduct is not stopped.

2.     Defendants have manipulated, are continuing to manipulate, and have conspired to manipulate their payment rates to defraud the Health Care Providers and deny them reasonable payment for services, which the law requires.

---

[1] The Health Care Providers do not assert any causes of action with respect to any Patient whose health insurance was issued under Medicare Part C (Medicare Advantage) or is provided under the Federal Employee Health Benefits Act (FEHBA).  The Health Care Providers also do not assert any claims relating to Defendants' managed Medicaid business or with respect to the right to payment under any ERISA plan.  Finally, the Health Care Providers do not assert claims that are dependent on the existence of an assignment of benefits ("AOB") from any of Defendants' Members. Thus, there is – and was – no basis to remove this lawsuit to federal court under federal question jurisdiction.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**PARTIES**

3.     Plaintiff Fremont Emergency Services (Mandavia), Ltd. ("Fremont") is a professional emergency medicine services group practice that staffs the emergency departments at ER at Aliante; ER at The Lakes; Mountainview Hospital; Dignity Health – St. Rose Dominican Hospitals, Rose de Lima Campus; Dignity Health – St. Rose Dominican Hospitals, San Martin Campus; Dignity Health – St. Rose Dominican Hospitals, Siena Campus; Southern Hills Hospital and Medical Center; and Sunrise Hospital and Medical Center located throughout Clark County, Nevada.   Fremont is part of the TeamHealth Holdings, Inc. ("TeamHealth") organization.

4.     Plaintiff Team Physicians of Nevada-Mandavia, P.C. ("Team Physicians") is a professional emergency medicine services group practice that staffs the emergency department at Banner Churchill Community Hospital in Fallon, Nevada.

5.     Plaintiff Crum, Stefanko And Jones, Ltd. dba Ruby Crest Emergency Medicine ("Ruby Crest") is a professional emergency medicine services group practice that staffs the emergency department at Northeastern Nevada Regional Hospital in Elko, Nevada.

6.     Defendant UnitedHealth Group, Inc. ("UHG") is the largest single health carrier in the United States and is a Delaware corporation with its principal place of business in Minnesota.   UHG is a publicly-traded holding company that is dependent upon monies (including dividends and administrative expense reimbursements) from its subsidiaries and affiliates which include all of the other Defendant entities named herein.

7.     Defendant United HealthCare Insurance Company ("UHCIC") is a Connecticut corporation with its principal place of business in Connecticut.   UHCIC is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. On information and belief, United HealthCare Insurance Company is a licensed Nevada health and life insurance company.

8.     Defendant United HealthCare Services, Inc. dba UnitedHealthcare ("UHC Services") is a Minnesota corporation with its principal place of business in Connecticut and affiliate of UHCIC.   UHC Services is responsible for administering and/or paying for certain

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

emergency medical services at issue in the litigation. On information and belief, United HealthCare Services, Inc. is a licensed Nevada health insurance company.

9.     Defendant UMR, Inc. dba United Medical Resources ("UMR") is a Delaware corporation with its principal place of business in Connecticut and affiliate of UHCIC. UMR is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. On information and belief, UMR is a licensed Nevada health insurance company.

10.     Defendant Oxford Health Plans, Inc. ("Oxford") is a Delaware corporation with its principal place of business in Connecticut and affiliate of UHCIC. Oxford is responsible for administering and/or paying for certain emergency medical services at issue in the litigation.

11.     Defendant Sierra Health and Life Insurance Company, Inc. is a Nevada corporation and affiliate of UHCIC. Sierra Health is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. On information and belief, Sierra Health is a licensed Nevada health insurance company.

12.     Defendant Sierra Health-Care Options, Inc. ("Sierra Options") is a Nevada corporation and affiliate of UHCIC. Sierra Options is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. On information and belief, Sierra Options is a licensed Nevada health insurance company.

13.     Defendant Health Plan of Nevada, Inc. ("HPN") is a Nevada corporation and affiliate of UHCIC. HPN is responsible for administering and/or paying for certain emergency medical services at issue in the litigation. On information and belief, HPN is a licensed Nevada Health Maintenance Organization ("HMO").

14.     There may be other persons or entities, whether individuals, corporations, associations, or otherwise, who are or may be legally responsible for the acts, omissions, circumstances, happenings, and/or the damages or other relief requested by this Complaint. The true names and capacities of Does 1-10 and Roes Entities 11-20 are unknown to the Health Care Providers, who sues those defendants by such fictitious names. The Health Care Providers will seek leave of this Court to amend this Complaint to insert the proper names of the defendant

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Doe and Roe Entities when such names and capacities become known to the Health Care Providers.

**JURISDICTION AND VENUE**

15.   The amount in controversy exceeds the sum of fifteen thousand dollars ($15,000.00), exclusive of interest, attorneys' fees and costs.

16.   The Eighth Judicial District Court, Clark County, has subject matter jurisdiction over the matters alleged herein since only state law claims have been asserted and no diversity of citizenship exists.  The Health Care Providers contest this Court's subject matter jurisdiction over the matters alleged herein and have moved to remand.  *See* Motion to Remand (ECF No. 5).  The Health Care Providers do not waive their continued objection to Defendants' removal based on alleged preemption under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Venue is proper in Clark County, Nevada.

**FACTS COMMON TO ALL CAUSES OF ACTION**

*The Health Care Providers Provide Necessary Emergency Care to Patients*

17.   The Health Care Providers are professional practice groups of emergency medicine physicians and healthcare providers that provides emergency medicine services 24 hours per day, 7 days per week to patients presenting to the emergency departments at hospitals and other facilities in Nevada staffed by the Health Care Providers.  The Health Care Providers provide emergency department services throughout the State of Nevada.

18.   The Health Care Providers and the hospitals whose emergency departments they staff are obligated by both federal and Nevada law to examine any individual visiting the emergency department and to provide stabilizing treatment to any such individual with an emergency medical condition, regardless of the individual's insurance coverage or ability to pay.  *See* Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; NRS 439B.410.  The Health Care Providers fulfill this obligation for the hospitals which they staff.  In this role, the Health Care Providers' physicians provide emergency medicine services to all patients, regardless of insurance coverage or ability to pay, including to Patients with insurance coverage issued, administered and/or underwritten by Defendants.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ⬩ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 ⬩ LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 ⬩ FAX 702.873.9966

19.    Upon information and belief, Defendants operate as an HMO under NRS Chapter 695C, and is an insurer under NRS Chapters 679A, 689A (Individual Health Insurance), 689B (Group and Blanket Health Insurance), 689C (Health Insurance for Small Employers) and 695G (Managed Care Organization).  Defendants provide, either directly or through arrangements with providers such as hospitals and the Health Care Providers, healthcare benefits to its members.

20.    There is no written agreement between Defendants and the Health Care Providers for the healthcare claims at issue in this litigation; the Health Care Providers are therefore designated as a "non-participating" or "out-of-network" provider for all of the claims at issue. An implied-in-fact agreement exists between the Health Care Providers and Defendants, however.

21.    Because federal and state law requires that emergency services be provided to individuals by the Health Care Providers without regard to insurance status or ability to pay, the law protects emergency service providers -- like Fremont here -- from predatory conduct by payors, including the kind of conduct in which Defendants have engaged leading to this dispute. If the law did not do so, emergency service providers would be at the mercy of such payors. the Health Care Providers would be forced to accept payment at any rate or no rate at all dictated by insurers under threat of receiving no payment, and then the Health Care Providers would be forced to transfer the financial burden of care in whole or in part onto Patients.  The Health Care Providers are protected by law, which requires that for the claims at issue, the insurer must reimburse the Health Care Providers at a reasonable rate or the usual and customary rate for services they provide.

22.    The Health Care Providers regularly provide emergency services to Defendants' Patients.

23.    Defendants are contractually and legally responsible for ensuring that Patients receive emergency services without obtaining prior approval and without regard to the "in network" or "out-of-network" status of the emergency services provider.

24.    The uhc.com website state:

> There are no prior authorization requirements for emergency services in a true emergency, even if the emergency services are

provided by an out-of-network provider. Payment for the emergency service will follow the plan rules for network emergency coverage. This provision applies to all non-grandfathered fully insured and self-funded group health plans [Fully Funded plans], as well as group and individual health insurance issuers [Employer Funded plans].

25.     Relevant to this action:

a.     From July 1, 2017 through the present, Fremont has provided emergency medicine services to Defendants' Members as an out-of-network provider of emergency services as follows: ER at Aliante (approximately July 2017-present); ER at The Lakes (approximately July 2017-present); Mountainview Hospital (approximately July 2017-present); Dignity Health – St. Rose Dominican Hospitals, Rose de Lima Campus (approximately July 2017-October 2018); Dignity Health – St. Rose Dominican Hospitals, San Martin Campus approximately (July 2017-October 2018); Dignity Health – St. Rose Dominican Hospitals, Siena Campus (approximately July 2017-October 2018); Southern Hills Hospital and Medical Center (approximately July 2017-present); and Sunrise Hospital and Medical Center (approximately July 2017-present).

b.     At all times relevant hereto, Team Physicians and Ruby Crest have provided emergency medicine services to Defendants' Members as out-of-network providers of emergency services at Banner Churchill Community Hospital in Fallon, Nevada and Northeastern Nevada Regional Hospital in Elko, Nevada, respectively.

26.     Defendants have generally adjudicated and paid claims with dates of service through July 31, 2019.  As the claims continue to accrue, so do the Health Care Providers' damages.  For each of the claims for which the Health Care Providers seek damages, Defendants have already determined the claim was covered and payable.

### The Relationship Between the Health Care Providers and Defendants

27.     Defendants provide health insurance to their members (*i.e.*, their insureds).

28.     In exchange for premiums, fees, and/or other compensation, Defendants are responsible for paying for health care services rendered to members covered by their health plans.

…

29.   In addition, Defendants provide services to their Members, such as building participating provider networks and negotiating rates with providers who join their networks.

30.   Defendants offer a range of health insurance plans. Plans generally fall into one of two categories.

31.   "Fully Funded" plans are plans in which Defendants collect premiums directly from their members (or from third parties on behalf of their members) and pay claims directly from the pool of funds created by those premiums.

32.   "Employer Funded" plans are plans in which Defendants provide administrative services to their employer clients, including processing, analysis, approval, and payment of health care claims, using the funds of the claimant's employer.

33.   Defendants provide coverage for emergency medical services under both types of plans.

34.   Defendants are contractually and legally responsible for ensuring that their members can receive such services (a) without obtaining prior approval and (b) without regard to the "in network" or "out-of-network" status of the emergency services provider.

35.   Defendants highlight such coverage in marketing their insurance products.

36.   For example, on the "patient protections" section of Defendants' website, uhc.com, Defendants state:

> There are no prior authorization requirements for emergency services in a true emergency, even if the emergency services are provided by an out-of-network provider. Payment for the emergency service will follow the plan rules for network emergency coverage. This provision applies to all non-grandfathered fully insured and self-funded group health plans [Fully Funded plans], as well as group and individual health insurance issuers [Employer Funded plans].

37.   Payors typically demand a lower payment rate from contracted participating providers.

38.   In return, payors offer participating providers certainty and timeliness of payment, access to the payor's formal appeals and dispute resolution processes, and other benefits.

39.     For all claims at issue in this lawsuit, the Health Care Providers were non-participating providers, meaning they did not have an express contract with Defendants to accept or be bound by Defendants' reimbursement policies or in-network rates.

40.     Specifically, the reimbursement claims within the scope of this action are (a) non-participating commercial claims (including for patients covered by Affordable Care Act Exchange products), (b) that were adjudicated as covered, and allowed as payable by Defendants, (c) at rates below the billed charges and a reasonable payment for the services rendered, (d) as measured by the community where they were performed and by the person who provided them. These claims are collectively referred to herein as the "Non-Participating Claims."

41.     The Non-Participating Claims involve only commercial and Exchange Products operated, insured, or administered by the insurance company Defendants. They do not involve Medicare Advantage or Medicaid products.

42.     Further, the Non-Participating Claims at issue do not involve coverage determinations under any health plan that may be subject to the federal Employee Retirement Income Security Act of 1974, or claims for benefits based on assignment of benefits.[2]

43.     Those counts concern the *rate* of payment to which the Health Care Providers are entitled, not whether a *right* to receive payment exists.

44.     Defendants bear responsibility for paying for emergency medical care provided to their members regardless of whether the treating physician is an in-network or out-of-network provider.

45.     Defendants understand and expressly acknowledge that their members will seek emergency treatment from non-participating providers and that Defendants are obligated to pay for those services.

…

…

_____

[2]   The Health Care Providers understand, in any event, that Defendants do not require or rely upon assignments from their members in order to pay claims for services provided by the Health Care Providers to their members.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

***The Reasonable Rate for Non-Participating Emergency Services is Well-Established***

46.     Defendants have traditionally allowed payment at 75-90% of billed charges for the Health Care Providers' emergency services.

47.     Defendants have done so largely through the use of rental networks, which establish a reasonable rate for out-of-network provider services through arms-length negotiations between the rental network and providers on the one hand, and the rental network and health insurance companies on the other.

48.     Rental networks act as "brokers" between non-participating providers and health insurance companies.

49.     A rental network will secure a contract with a provider to discount its out-of-network charges.

50.     The rental network then contracts with (or "rents" its network to) health insurance companies to allow the insurer access to the rental network and to the providers' agreed-upon discounted rates.

51.     As such, rental networks' negotiated rates act as a proxy for a reasonable rate of reimbursement for out-of-network emergency services, both in the industry as a whole and for particular payors.

52.     For many years, the Health Care Providers' respective contracts with a range of rental networks, including MultiPlan, have contemplated a modest discount from the Health Care Providers' billed charges for claims adjudicated through the rental network agreement.

53.     In practice, nearly all of the Health Care Providers' non-participating provider claims submitted under Employer Funded plans from 2008 to 2017 were paid at between 75-90% of billed charges, including the Non-Participating Claims submitted to Defendants.

54.     This longstanding history establishes that a reasonable reimbursement rate for the Health Care Providers' Non-Participating Claims for emergency services is 75-90% of the Health Care Providers' billed charge.

55.     Beginning in approximately January 2019, Defendants have further slashed their reimbursement rate for Non-Participating Claims to less than 60%, and to as low as 12% of the

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

charges billed for professional services, rates that are well-below reasonable reimbursement rates.

56. Defendants' drastic payment cuts are entirely inconsistent with the established rate and history between the parties.

### Defendants Paid the Health Care Providers Unreasonable Rates

57. Defendants arbitrarily began manipulating the rate of payment for claims submitted by the Health Care Providers. Defendants drastically reduced the rates at which they paid the Health Care Providers for emergency services for some claims, but not others. Instead of paying a usual and customary rate of the charges billed by the Health Care Providers, Defendants paid some of the claims for emergency services rendered by the Health Care Providers at far below the usual and customary rates. Yet, Defendants paid other substantially identical claims (e.g. claims billed with the same Current Procedural Terminology (CPT) Code, as maintained by American Medical Association) submitted by the Health Care Providers at higher rates and in some instances at 100% of the billed charge.

a. For example, on October 10, 2017, Defendants' Member #1, presented to the emergency department at Southern Hills Hospital and was treated by Fremont's providers. The professional services were billed with CPT Code 99285 in the amount $1,295.00; Defendants allowed and paid $223.00, which is just 17% of the charges billed. By contrast, on October 9, 2017, Defendants' Member #2 presented to the emergency department at St. Rose Dominican Hospitals, Siena Campus. The professional services were billed with CPT Code 99285 in the amount $1,295.00; Defendants paid $1,295.00, 100% of the charges billed.

b. By way of further example, between January 9 and 31, 2019, Defendants' Members #3, #4, #5 all presented to emergency departments staffed by Fremont's providers. In each instance the professional services were billed with CPT Code 99285 and Defendants paid nearly all or 100% of the billed charges. By contrast, on February 26, 2019, Defendants' Members #6, #7 and #8 all presented to emergency departments staffed by Fremont. In each instance the professional services were billed with CPT Code 99285 in the amount of $1,360.00 and Defendants only paid $185.00, a mere 13.6% of the billed charges in each instance.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

c.   Further, Fremont's providers treated Member #9 on March 3, 2019. The professional services were billed at $971.00 (CPT 99284) and Defendants allowed $217.53, which is 22% of billed charges.

d.   The Health Care Providers do not assert any of the foregoing claims pursuant to, or in reliance on, any assignment of benefit by Defendants' Members.  Upon information and belief, Defendants do not require or rely upon assignment of benefits from their Members in order to pay claims for services provided by  the Health Care Providers.

58.   Defendants generally paid lower reimbursement rates for services provided to Members of their fully insured plans and authorize payment at higher reimbursement rates for services provided to Members of employer funded plans or those plans under which they provide administrator services only.

59.   The Health Care Providers have continued to provide emergency medicine treatment, as required by law, to Patients covered by Defendants' plans who seek care at the emergency departments where they provide coverage.

60.   Defendants bear responsibility for paying for emergency medical care provided to their Members regardless of whether the treating physician is an in-network or out-of-network provider.

61.   Defendants expressly acknowledge that their Members will seek emergency treatment from non-participating providers and that they are obligated to pay for those services.

62.   In emergency situations, individuals go to the nearest hospital for care, particularly if they are transported by ambulance.  Patients facing an emergency situation are unlikely to have the opportunity to determine in advance which hospitals and physicians are in-network under their health plan.  Defendants are obligated to reimburse the Health Care Providers at the usual and customary rate for emergency services the Health Care Providers provided to their Patients, or alternatively for the reasonable value of the services provided.

63.   Defendants' Members received a wide variety of emergency services (in some instances, life-saving services) from the Health Care Providers' physicians: treatment of

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

conditions ranging from cardiac arrest, to broken limbs, to burns, to diabetic ketoacidosis and shock, to gastric and/or obstetrical distress.

64.     As alleged herein, the Health Care Providers provided treatment on an out-of-network basis for emergency services to thousands of Patients who were Members in Defendants' Health Plans.  The total underpayment amount for these related claims is in excess of $15,000.00 and continues to grow.  Defendants have likewise failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of these claims.

65.     Defendants paid some claims at an appropriate rate and others at a significantly reduced rate which is demonstrative of an arbitrary and selective program and motive or intent to unjustifiably reduce the overall amount Defendants pay to the Health Care Providers. Defendants implemented this program to coerce, influence and leverage business discussions with the Health Care Providers to become a participating provider at significantly reduced rates, as well as to unfairly and illegally profit from a manipulation of payment rates.

66.     Defendants failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the subject claims as legally required.

67.     The Health Care Providers contested the unsatisfactory rate of payment received from Defendants in connection with the claims that are the subject of this action.

68.     All conditions precedent to the institution and maintenance of this action have been performed, waived, or otherwise satisfied.

69.     The Health Care Providers bring this action to compel Defendants to pay it the usual and customary rate or alternatively for the reasonable value of the professional emergency medical services for the emergency services that it provided and will continue to provide Patients and to stop Defendants from profiting from their manipulation of payment rate data.

### *Defendants' Prior Manipulation of Reimbursement Rates*

70.     Defendants have a history of manipulating their reimbursement rates for non-participating providers to maximize their own profits at the expense of others, including their own Members.

71.     In 2009, defendant UnitedHealth Group, Inc. was investigated by the New York Attorney General for allegedly using its wholly-owned subsidiary, Ingenix, to illegally manipulate reimbursements to non-participating providers.

72.     The investigation revealed that Ingenix maintained a database of health care billing information that intentionally skewed reimbursement rates downward through faulty data collection, poor pooling procedures, and lack of audits.

73.     Defendant UnitedHealth Group, Inc. ultimately paid a $50 million settlement to fund an independent nonprofit organization known as FAIR Health to operate a new database to serve as a transparent reimbursement benchmark.

74.     In a press release announcing the settlement, the New York Attorney General noted that: "For the past ten years, American patients have suffered from unfair reimbursements for critical medical services due to a conflict-ridden system that has been owned, operated, and manipulated by the health insurance industry."

75.     Also in 2009, for the same conduct, defendants UnitedHealth Group, Inc., United HealthCare Insurance Co., and United HealthCare Services, Inc. paid $350 million to settle class action claims alleging that they underpaid non-participating providers for services in *The American Medical Association, et al. v. United Healthcare Corp., et al.*, Civil Action No. 00-2800 (S.D.N.Y.).

76.     Since its inception, FAIR Health's benchmark databases have been used by state government agencies, medical societies, and other organizations to set reimbursement for non-participating providers.

77.     For example, the State of Connecticut uses FAIR Health's database to determine reimbursement for non-participating providers' emergency services under the state's consumer protection law.

78.     Defendants tout the use of FAIR Health and its benchmark databases to determine non-participating, out-of-network payment amounts on its website.

79.     As stated on Defendants' website (https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits) for non-participating provider claims, the relevant United

Health Group affiliate will "in many cases" pay the lower of a provider's actual billed charge or "the reasonable and customary amount," "the usual customary and reasonable amount," "the prevailing rate," or other similar terms that base payment on what health care providers in the geographic area are charging.

80.     While Defendants give the appearance of remitting reimbursement to non-participating providers that meet usual and customary rates and/or the reasonable value of services based on geography that is measured from independent benchmark services such as the FAIR Health database, Defendants have found other ways to manipulate the reimbursement rate downward from a usual and customary or reasonable rate in order to maximize profits at the expense of the Health Care Providers.

81.     During the relevant time, Defendants imposed significant cuts to the Health Care Providers' reimbursement rate for out-of-network claims under Defendants' fully funded plans, without rationale or justification.

82.     Defendants pay claims under fully funded plans out of their own pool of funds, so every dollar that is not paid to the Health Care Providers is a dollar retained by Defendants for their own use.

83.     Defendants' detrimental approach to payments for members in fully funded plans continues today, Defendants have made payments to the Health Care Providers at rates as low as 20% of billed charges.

84.     Team Physicians' providers treated Member #10 on March 15, 2019 and the professional services (CPT 99285) were billed in the amount of $1,138.00, but Defendants allowed $435.20 which is just 38% of the billed charges.

85.     In another example, Team Physicians' providers treated Member #11 on February 9, 2019 and the professional services (CPT 99285) were billed in the amount of $1,084.00, but Defendants allowed $609.28 which is just 56% of the billed charges.

86.     Further, Fremont's providers treated Member #12 on April 17, 2019 and the professional services were billed in the amount of $1,428.00 (CPT 99285), but defendants allowed $435.20 which is 30% of the billed charges.

87.     Fremont also treated Member #13 on March 25, 2019 and the professional services were billed in the amount of $973.00, but defendants allowed $214.51 which is 22% of the billed charges.

88.     As a result of these deep cuts in payments for services provided to Members of fully funded plans, Defendants have not paid the Health Care Providers a reasonable rate for those services since early 2019.

89.     In so doing, Defendants have illegally retained those funds.

### *Defendants' Current Schemes*

90.     In 2017, Defendants also attempted to pay less than a reasonable rate on their employer funded plans, further exacerbating the financial damages to the Health Care Providers.

91.     From late 2017 to 2018, over the course of multiple meetings in person, by phone, and by email correspondence, the Health Care Providers' representatives tried to negotiate with Defendants to become participating, in-network providers.

92.     As part of these negotiations, the Health Care Providers' representatives met with Dan Rosenthal, President of Defendant UnitedHealth Networks, Inc., John Haben, Vice President of Defendant UnitedHealth Networks, Inc., and Greg Dosedel, Vice President of National Ancillary Contracting & Strategy at Defendant UnitedHealthCare Services, Inc.

93.     Around December 2017, Mr. Rosenthal told the Health Care Providers' representatives that Defendants intended to implement a new benchmark pricing program specifically for their employer funded plans to decrease the rate at which such claims were to be paid.

94.     Defendants then proposed a contractual rate for their employer funded plans that was roughly half the average reasonable rate at which Defendants have historically reimbursed providers – a drastic and unjustified discount from what Defendants have been paying the Health Care Providers on their non-participating claims in these plans, and an amount materially less than what Defendants were paying other contracted providers in the same market.

95.     Defendants' proposed rate was neither reasonable nor fair.

96.     In May 2018, Mr. Rosenthal escalated his threats, making clear during a meeting that, if the Health Care Providers did not agree to contract for the drastically reduced rates, Defendants would implement benchmark pricing that would reduce the Health Care Providers' non-participating reimbursement by 33%.

97.     Dan Schumacher, the President and Chief Operating Officer of UnitedHealthcare Inc. and part of the Office of the Chief Executive of Defendant UnitedHealth Group, Inc., said that, by April 2019, Defendants would cut the Health Care Providers' non-participating reimbursement by 50%.

98.     Asked why Defendants were forcing such dramatic cuts on the Health Care Providers' reimbursement, Mr. Schumacher said simply "because we can."

99.     Defendants made good on their threats and knowingly engaged in a fraudulent scheme to slash reimbursement rates paid to the Health Care Providers for non-participating claims submitted under their employer funded plans to levels at, or even below, what they had threatened in 2018.

100.    Defendants falsely claim that their new rates comply with the law because they contracted with a purportedly objective and transparent third party, Data iSight, to process the Health Care Providers' claims and to determine reasonable reimbursement rates.

101.    Data iSight is the trademark of an analytics service used by health plans to set payment for claims for services provided to Defendants' Members by non-participating providers.  Data iSight is owned by National Care Network, LLC, a Delaware limited liability company with its principal place of business in Irving, Texas.  Data iSight and National Care Network, LLC will be collectively referred to as "Data iSight." Data iSight is a wholly-owned subsidiary of MultiPlan, Inc., a New York corporation with its principal place of business in New York, NY.   MultiPlan acts as a Rental Network "broker" and, in this capacity, has contracted since as early as June 1, 2016 with some of the Health Care Providers to secure reasonable rates from payors for the Health Care Providers' non-participating emergency services.   The Health Care Providers have no contract with Data iSight, and the Non-

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   Participating Claims identified in this action are not adjudicated pursuant to the MultiPlan

2   agreement.

3       102.    Since January 2019, Defendants have engaged in a scheme and conspired with

4   Data iSight to impose arbitrary and unreasonable payment rates on the Health Care Providers

5   under the guise of utilizing an independent, objective database purportedly created by Data

6   iSight to dictate the rates imposed by Defendants.

7       103.    Defendants also continued to advance this scheme on the negotiation front.

8       104.    On July 7, 2019, Mr. Schumacher advised, in a phone call, that Defendants

9   planned to cut the Health Care Providers' rates over three years to just 42% of the average and

10  reasonable rate of reimbursement that the Health Care Providers had received in 2018 if the

11  Health Care Providers did not formally contract with them at the rate dictated by Defendants.

12      105.    Mr. Schumacher additionally advised that leadership across the Defendant

13  entities were aware and supportive of the drastic cuts and provided no objective basis for them.

14      106.    The next day, Angie Nierman, a Vice President of Networks at UnitedHealth

15  Group, Inc., sent a written proposal reflecting Mr. Schumacher's stated cuts.

16      107.    In addition to denying the Health Care Providers what is owed to them for the

17  Non-Participating Claims, Defendants' scheme is an attempt to use their market power to reset

18  the rate of reimbursement to unreasonably low levels.

19      108.    As further evidence of Defendants' scheme to use their market power to the

20  detriment of the Health Care Providers and other emergency provider groups that are part of the

21  TeamHealth organization, in August 2019, UHG advised at least one Florida medical surgical

22  facility (the "Florida Facility") that Defendants will not continue negotiating an in-network

23  agreement unless the Florida Facility identifies an in-network anesthesia provider.  The current

24  out-of-network anesthesia provider is part of the TeamHealth organization.  Defendants' threats

25  to discontinue contract negotiations prompted the Florida Facility's Chief Operating Officer to

26  send TeamHealth a "Letter of Concern" on August 14, 2019.  Defendants' threats and leverage

27  are aimed at intentionally interfering with existing contracts and with a goal of reducing

28  TeamHealth's market participation.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

109.    Additionally, Defendants first threatened, and then, on or about July 9, 2019, globally terminated all existing in-network contracts with medical providers that are part of the TeamHealth organization, including the Health Care Providers, in an effort to widen the scale of the scheme to deprive the Health Care Providers of reasonable reimbursement rates through its manipulation of reimbursement rate data.

***Defendants' Fraudulent Schemes to Deprive the Health Care Providers***

***of Reasonable Reimbursement Violates Nevada's Civil Racketeering Statute***

110.    Each Defendant, UnitedHealth Group, Inc., United Healthcare Insurance Company, United Health Care Services Inc., UMR, Inc., Oxford Benefit Management, Inc., Sierra Health and Life Insurance Company, Inc., Sierra Health-Care Options, Inc., Health Plan of Nevada, Inc. (collectively "Defendants") violated NRS 207.350 *et seq.* by committing the following crimes related to racketeering activity: NRS 207.360(28) (obtaining possession of money or property valued at $650 or more), NRS 207.360(35) (any violation of NRS 205.377), and NRS 207.360(36) (involuntary servitude) and that the Defendants devised, conducted, and participated in with unnamed third parties, including, but not limited to, Data iSight.

111.    The Enterprise, as defined in NRS 207.380 consists of the Defendants, non-parties Data iSight and other entities that develop software used in reimbursement determinations used by the Defendants (the "Enterprise").  The participants of the Enterprise are associated, upon information and belief, by virtue of contractual agreement(s) and/or other arrangement(s) wherein they have agreed to undertake a common goal of reducing payments to the Health Care Providers for the benefit of the Enterprise.  The Enterprise participants communicate routinely through telephonic and electronic means as they unilaterally impose reimbursement rates based on their manipulated "data" but which is nothing more than a transparent attempt to impose artificially reduced reimbursement rates that the Defendants threatened during business-to-business negotiations.

112.    The Defendants illegally conduct the affairs of the Enterprise, and/or control the Enterprise, that includes Data iSight, through a pattern of unlawful activity.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

113.    As part of this scheme, the Defendants prepared to, and did knowingly and unlawfully, reduce the Health Care Providers' reimbursement rates for the non-participating claims to amounts significantly below the reasonable rate for services rendered to Defendants' Members, to the detriment of the Health Care Providers and to the benefit and financial gain of Defendants and Data iSight.

114.    To carry out the scheme and in furtherance of the conspiracy, Defendants and Data iSight engaged in conduct violative of NRS 207.400.

115.    Since January 2019, the Enterprise worked together to manipulate and artificially lower non-participating provider reimbursement data that coincides and matches the earlier threats made by UHG in an effort to avoid paying the Health Care Providers for the usual and customary fee or rate and/or for the reasonable value of the services provided to Defendants' Members for emergency medicine services.  The unilateral reduction in reimbursement rates is not founded on actual statistically sound data, and is not in line with reimbursement rates that can be found through sites such as the FAIR Health database, a recognized source for such reimbursement rates.    Each time the Defendants direct payment using manipulated reimbursement rates and issue the Health Care Providers a remittance, the Defendants further their scheme or artifice to defraud Fremont because the Defendants retain the difference between the amount paid based on the artificially reduced reimbursement rate and the amount paid that should be paid based on the usual and customary fee or rate and/or the reasonable value of services provided, to the detriment of the Health Care Providers who have already performed the services being billed.  Further, the Health Care Providers' representatives have contacted Data iSight and have been informed that acceptable reimbursement rates are actually influenced and/or determined by Defendants, not Data iSight.

116.    As a result of the scheme, Defendants have injured the Health Care Providers in their business or property by a pattern of unlawful activity by reason of their violation of NRS 207.400(1)(a)- (d), (1)(f), (1)(i)-(j).  *See* NRS 207.470.

…

…

*Defendants' and Data iSight's Activities Constitute Racketeering Activity*

117.    Defendants and Data iSight committed, and continue to commit, crimes related to racketeering pursuant to NRS 207.360 that have the same or similar pattern, intents, results, accomplices, victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents in violation of NRS 207.360(28) (obtaining possession of money or property valued at $650 or more), NRS 207.360(35) (any violation of NRS 205.377), and NRS 207.360(36) (involuntary servitude) such that they have engaged in racketeering activity as defined by NRS 207.400 and which poses a continued threat of unlawful activity such that they constitute a criminal syndicate under NRS 207.370.

118.    Defendants and Data iSight have knowingly, wrongfully, and unlawfully reduced payment to the Health Care Providers for the emergency services that the Health Care Providers provided to Defendants' Members, for the financial gain of the Defendants and Data iSight.

119.    The racketeering activity has happened on more than two occasions that have happened within five years of each other.  In fact, the Defendants have processed and submitted a substantial number of artificially reduced payments to the Health Care Providers since January 2019 in furtherance of Defendants' unlawful conduct.

120.    As a direct and proximate result of those activities, the Health Care Providers have suffered millions of dollars in discrete and direct financial loss that stem from the Defendants' knowing retention of payment that is founded on a scheme to manipulate payment rates and payment data to their benefit.

*The Enterprise and Scheme*

121.    The Enterprise is comprised of Defendants and third-party entities, to include Data iSight, that developed software used in reimbursement determinations by Defendants.

122.    Defendants and Data iSight agreed to, and do, manipulate reimbursement rates and control allowed payments to the Health Care Providers through acts of the Enterprise.

123.    The Defendants and Data iSight conceal their scheme by hiding behind written agreements and/or other arrangements, and false statements.

124.    Since at least January 1, 2019, the Defendants, by virtue of their engagement and use of Data iSight, have falsely claimed to provide transparent, objective, and geographically-adjusted determinations of reimbursement rates.

125.    In reality, Data iSight is used as a cover for Defendants to justify paying reimbursement to the Health Care Providers at rates that are far less than the reasonable payment rate that the Health Care Providers have historically received and are entitled to under the law. The reimbursement rates purportedly collected and employed by Data iSight are nothing more than an instrumentality for the Defendants' unilateral decision to stop paying the Health Care Providers the usual and customary fee and/or the reasonable value of the services provided.

126.    This scheme is concealed through the use of false statements on Data iSight's website and in Defendants' and Data iSight's communications with providers, including the Health Care Providers' representatives.

127.    The Enterprise's scheme, as described below, was, and continues to be, accomplished through written agreements, association, and sharing of information between Defendants and Data iSight.

### *The Enterprise's False Statements: Transparency*

128.    By the end of June 2019, an increasingly significant amount of non-participating claims submitted to Defendants were being processed for payment by Data iSight.

129.    The Data iSight website claims to offer "Transparency for You, the Provider," and that the "website makes the process for determining appropriate payment transparent to [providers]. . . so all parties involved in the billing and payment process have a clear understanding of how the reduction was calculated."

130.    Contrary to these claims, however, the Enterprise, through Data iSight, uses layers of obfuscation to hide and avoid providing the basis or method it uses to derive its purportedly "appropriate" rates.

131.    This concealment was designed by the Enterprise to, and does, prevent the Health Care Providers from receiving a reasonable payment for the services it provides.

132.   For claims whose reimbursement is determined by Data iSight, non-participating providers receive a Provider Remittance Advice form ("Remittance") from Defendants with "IS" or "1J" in the "Remark/Notes" column.

133.   Over the past six months, an ever-increasing number of non-participating claims have been processed by Data iSight with drastically reduced payment amounts.

134.   Yet Defendants and Data iSight do not state, on the face of the Remittance, or anywhere else, any reason for the dramatic cut.

135.   Instead, the Remittances contain a note to call a toll-free number if there are questions about the claim.

136.   In July 2019, a representative of Team Physicians contacted Data iSight via that number to discuss three separate claims with CPT Code 99285 (emergency department visit, problem of highest severity) which had been billed at $1,084.00, but for which Data iSight had allowed two claims at $435.20 (40% of billed charges) and one at $609.28 (56% of billed charges).  After Team Physicians' representative spoke with Data iSight's intake representative, a Data iSight representative, Kimberly (Last Name Unknown) ("LNU") ("Kimberly"), called back and she asked if Team Physicians wanted a proposal for one of the inquired-upon claims. Team Physicians' representative indicated that he was interested in learning more and asked what reimbursement rate would be offered.  Kimberly stated, "I have to look at a couple of things and decide."  Thereafter, Kimberly sent the Team Physicians' representative a proposed Letter of Agreement (prepared July 31, 2019) (ICN: 48218522) offering to increase the allowed amount from $609.28 to $758.80 – increasing the amount to 70% of billed charges instead of 56% – as payment in full and an agreement not to balance bill Defendants' Member or Member's family.  All it took was one call and a request for a more reasonable payment and almost immediately Defendant United Healthcare Services increased the amount it would pay, although still not to the level that the Health Care Providers consider to be reasonable.

137.   Medical providers that are part of the TeamHealth organization have experienced this same trend across the country with Data iSight.  In one instance, in July 2019, a representative of another provider, Emergency Group of Arizona Professional Corporation (the

McDONALD ⬥ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

"AZ Provider"), contacted Data iSight via that number to discuss a claim with CPT Code 99284 (emergency department visit, problem of high severity) which had been billed at $1,190.00, but for which Data iSight had allowed and paid $295.28, just 24.8% of billed charges.

138.   After the AZ Provider's representative spoke with Data iSight's intake representative, a Data iSight representative, Michele Ware ("Ware"), called back and claimed the billed charges were paid based on a percentage of the Medicare fee schedule.   The AZ Provider's representative challenged the reasonableness of the $295.28 payment.   After learning that the AZ Provider had not yet billed Defendants' Member for the difference, Ware stated "ok – so you're willing negotiate" and offered to pay 80% of billed charges.   In response, the AZ Provider's representative asked for payment of 85% of billed charges – $1,011.50 – to which Ware promptly agreed.   Immediately thereafter, Ware sent a written agreement for the AZ Provider's representative to review and sign, confirming payment of $1,011.50 as payment in full and an agreement not to balance bill Defendants Services' Member or Member's family.

139.   In another instance, when asked to provide the basis for the dramatic cut in payment for the claims, a Data iSight representative by the name of Phina LNU, did not and could not explain how the amount was derived or how it was determined that a cut was appropriate at all.   The representative could only say that the payments on the claims represented a certain percentage of the Medicare fee schedule; she could not explain how Data iSight had arrived at that payment for either of the two claims, or why it allowed a different amount for each claim.

140.   Instead, the representative simply stated that the rates were developed by Data iSight and Defendants.   When the Health Care Providers' representative continued to pursue the issue and spoke with a Data iSight supervisor, James LNU, to inquire as to the basis for these determinations, James LNU responded that "it is just an amount that is recommended and sent over to United [HealthCare]."   When James LNU was expressly challenged on Data iSight's false claim that it is transparent with providers, he responded with silence.

141.   Further attempts to understand Data iSight and obtain information about the basis for its reimbursement rate-setting from Data iSight executives have also been futile.

142.    Data iSight and the Defendants know that the rates that Data iSight have allowed for the Health Care Providers' claims in 2019 are unreasonable and are not, in fact, based on objective, reliable data designed to arrive at a reasonable reimbursement rate.

143.    Defendants know this because when a provider challenges the payment, Data iSight and Defendants are authorized to revise the allowed amount back up to a reasonable rate, but only if the Health Care Providers persist long enough in the process.

144.    This process to contest the unreasonable payment takes weeks to conclude for the Health Care Providers and is impracticable to follow for every claim – a fact that Defendants and Data iSight understand.

145.    For example, as evidence of this fraudulent practice, the Health Care Providers' representatives contested the allowed amounts on the claim discussed above in paragraph 136.

146.    Eventually, Data iSight, offered to allow payment of at least one claim at 70% of the billed charges.

147.    Absent providers taking the time to chase every claim, Data iSight and Defendants are able to get away with paying a rate that they know is not based on objective data and is far below the reasonable one.

148.    Moreover, the Enterprise's scheme of refusing to reimburse at reasonable rates unless and until the Health Care Providers challenge its determinations continually harms the Health Care Providers, in that, even if they eventually receive reasonable reimbursement upon contesting the rate, this scheme burdens them with excessive administrative time and expense and deprives the Health Care Providers of their right to prompt payment.

### *The Enterprise's False Statements:  Representations that*
### *Payment Rates Are "Defensible and Market Tested"*

149.    The Enterprise's claim to "transparency" is not its only fraudulent representation.

150.    The Enterprise, through Data iSight, also falsely represents, on Data iSight's website, to set reimbursement rates in a "defensible, market tested" way.

151.    Claims processed by Data iSight contain the following note:

MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NETWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835- 4022 OR VISIT DATAISIGHT.COM. THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. **PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS).** PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE. IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT.

(emphasis added).

152.     This note is intended to, and does, mislead the Health Care Providers to believe that the reimbursement calculations are tied to external, objective data.

153.     Further, in its provider portal, Data iSight describes its "methodology" for reimbursement determinations as "calculated using paid claims data from millions of claims . . . . The Data iSight reimbursement calculation is based upon standard relative value units where applicable for each CPT/HCPCS code, multiplied by a conversion factor."

154.     Data iSight's parent company, MultiPlan, similarly describes Data iSight's process as using "cost- and reimbursement-based methodologies" and notes that it has been "[v]alidated by statisticians as effective and fair."

155.     These statements are false.

156.     Data iSight's rates are not data-driven: they match the rate threatened by Defendants in 2018 and are whatever Defendants want, and direct Data iSight, to allow.

157.     For example, the Health Care Providers submitted claims for Members but received reimbursement in very different allowed amounts:

     a.     Member #14 was treated on May 9, 2019.  Fremont billed Defendants $973.00 for procedure code 99284, and Defendants allowed $875.70 through MultiPlan, which is approximately 90% of billed charges – a reasonable rate, in line with the reasonable rate paid by Defendants to Fremont for non-participating provider services.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

b.   But, for Member #15, who was treated on May 24, 2019, Defendants, through Data iSight, allowed only $295.28 for billed charges of $1,019.00, which is only 29% of the billed charges.

c.   Further, at just one site, Defendants allowed and paid Team Physicians at varying amounts for the same procedure code (99285) (Members ##16a-16e):

i.   Date of Service ("DOS"): January 4, 2019; Charge $1084.00; Allowed $609.28 (56% of Charge and reimbursed using Data iSight);

ii.   DOS: January 15, 2019; Charge $1084.00; Allowed $294.60 (27% of Charge);

iii.   DOS: January 24, 2019; Charge $1084.00; Allowed $435.20 (40% of Charge and reimbursed using Data iSight);

iv.   DOS: January 29, 2019; Charge $1084.00; Allowed $328.39 (30% of Charge); and

v.   DOS: February 7, 2019; Charge $1084.00; Allowed $435.20 (40% of Charge and reimbursed using Data iSight).

158.   This lock-step reduction, consistent with Defendants' 2018 threats to drastically reduce rates even further if the Health Care Providers failed to agree to their proposed contractual rates, spans a significant number of the Health Care Providers' claims for payment for services to Defendants' Members.

159.   From the above examples, it is clear that Data iSight is not using any externally-validated methodology to establish a reasonable reimbursement rate, as its rates are not consistent, defensible, or reasonable.

160.   Rather, Defendants, in complicity with Data iSight, increasingly reimburse the Health Care Providers at entirely unreasonable rates, in retaliation for the Health Care Providers' objections to their reimbursement scheme, and completely contrary to their false assertions designed to mislead the Health Care Providers and similar providers into believing that they will receive payment at reasonable rates.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

161.   This reimbursement is dictated by Defendants, to the financial detriment of the Health Care Providers.

*The Enterprise's False Statements:  Geographic Adjustment*

162.   In addition to false statements regarding transparency and its methodologies, the Enterprise furthered the scheme by using false statements promising geographic adjustments to allowed rates.

163.   Indeed, on its provider portal, Data iSight falsely claims that "[a]ll reimbursements are adjusted based on your geographic location and the prevailing labor costs for your area."

164.   Data iSight's parent company, MultiPlan, further falsely states on its website that:

> For professional claims where actual costs aren't readily available, Data iSight determines a fair price using amounts generally accepted by providers as full payment for services. Claims are first edited, and then priced using widely-recognized, AMA created Relative Value Units (RVU), to take the value and work effort into account [and] CMS Geographic Practice Cost Index, to adjust for regional differences . . . [then] Data iSight multiplies the geographically-adjusted RVU for each procedure by a median based conversion factor to determine the reimbursement amount. This factor is specific to the service provided and derived from a publicly-available database of paid claims.

165.   Contrary to those statements, however, claims from providers in different geographic locations show that Data iSight does not adjust for geographic differences but instead, works with Defendants to cut uniformly out-of-network provider payments across geographic locations.

166.   For example, Member WY was treated in Wyoming on January 21, 2019.  The provider billed Defendants $779 for procedure code 99284, and Defendants, via Data iSight, allowed $413.39.

167.   Four days later, on January 25, 2019, Member AZ in Arizona and billed Defendants $1,212.00 for CPT Code 99284 and Defendants, via Data iSight, allowed exactly $413.39.

…

…

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

168.   On the same date, Member NH was treated on the other side of the country in New Hampshire. The provider billed Defendants $1,047 for procedure 99284, and Defendants, via Data iSight, again allowed $413.39.

169.   On February 8, 2019, Member OK was treated in Oklahoma. The provider billed Defendants $990 for procedure code 99284, and Defendants, via Data iSight, allowed $413.39.

170.   Two days later, Members KS and NM were treated in Kansas and New Mexico, respectively. The providers billed Defendants $778.00 and $895.00, respectively, for procedure code 99284, but for both of these claims, Defendants, via Data iSight, allowed exactly $413.39.

171.   One month later, Member CA was treated in California and Member NV was treated in Nevada. The CA provider billed Defendants $937.00 for procedure code 99284. Defendants, via Data iSight, yet again allowed exactly $413.39.  A Health Care Provider billed Defendants $763.00 for procedure code 99284 and, via Data iSight, Defendants again allowed exactly $413.39.

172.   Two months later, on May 20, 2019, a provider treated Member PA in Pennsylvania and billed Defendants $1,094 for procedure code 99284, and Defendants, via Data iSight, allowed exactly $413.39.

| Patient | Location | Date of Service | Billed Amount | CPT Code | Allowed Amount – "DataiSight™ Reprice" |
|---------|----------|-----------------|---------------|----------|------------------------------------------|
| WY | Wyoming | 1/21/19 | $779 .00 | 99284 | $413.39 |
| AZ | Arizona | 1/25/19 | $1,212.00 | 99284 | $413.39 |
| NH | New Hampshire | 1/25/19 | $1047.00 | 99284 | $413.39 |
| OK | Oklahoma | 2/8/19 | $990.00 | 99284 | $413.39 |
| KS | Kansas | 2/10/19 | $778.00 | 99284 | $413.39 |
| NM | New Mexico | 2/10/19 | $895.00 | 99284 | $413.39 |
| CA | California | 3/25/19 | $937.00 | 99284 | $413.39 |
| NV | Nevada | 3/30/19 | $763.00 | 99284 | $413.39 |
| PA | Pennsylvania | 5/20/19 | $1,094.00 | 99284 | $413.39 |

173.   Defendants falsely claim on their website to "frequently use" the 80th percentile of the FAIR Health Benchmark databases "to calculate how much to pay for out-of-network services."

174.     The 80th percentile of FAIR Health Benchmark databases clearly shows that reimbursement for the above non-participating provider charges, when actually based on a geographically-adjusted basis, would not only vary widely, but also all be higher than the allowed $413.39:

| Location | CPT Code | 80th Percentile of Fair Health Benchmark |
|----------|----------|------------------------------------------|
| Wyoming | 99284 | $1,105.00 |
| New Hampshire | 99284 | $753.00 |
| Oklahoma | 99284 | $1,076.00 |
| Kansas | 99284 | $997.00 |
| New Mexico | 99284 | $1,353.00 |
| California | 99284 | $795.00 |
| Pennsylvania | 99284 | $859.00 |
| Arizona | 99284 | $1,265.00 |
| Nevada | 99284 | $927.00 |

### The Enterprise's Predicate Acts

175.     To perpetuate the scheme and conceal it from the Health Care Providers, in or around 2018, Defendants and Data iSight entered into written agreements with each other that are consistent with Data iSight's agreements with similar health insurance companies.

176.     Under those contracts, Data iSight would handle claims determinations for services rendered to Defendants' Members under pre-agreed thresholds set by Defendants.

177.     By no later than 2019, Defendants and Data iSight then coordinated and effectuated the posting of false statements on websites and the communication of false statements to providers, including the Health Care Providers, in furtherance of the scheme.

178.     These statements include Data iSight and its parent company posting that it would provide a transparent, defensible, market-based, and geographically-adjusted claims adjudication and payment process for providers.

179.     Data iSight communicated to the Health Care Providers' representatives by phone and by email in June 2019 that, contrary to its website's claims to transparency, Data iSight could not provide a basis for its unreasonably low allowed amount, mustering only that "it is just an amount that is recommended and sent over to United [HealthCare]."

180.    Finally, after weeks of pressure, Data iSight informed the Health Care Providers' representative by phone that it would, after all, allow payment on the contested claims at a reasonable rate: 85% of billed charges.

181.    In short, the Enterprise perpetuated its scheme by communicating threats regarding reimbursement cuts to the Health Care Providers in late 2017 and 2018.

182.    Then, after making good on those threats, the Enterprise communicated false and misleading information to the Health Care Providers and falsely denied that it had information requested by the Health Care Providers about the basis for the drastically-cut and unreasonable reimbursement rates that Defendants sought to impose.

183.    In addition, since at least January 1, 2019, the Enterprise has furthered this scheme by communicating payment amounts and making reimbursement payments to the Health Care Providers at rates that were far below usual and customary rates and/or reasonable rates for the services provided.

184.    For example, Defendants sent Fremont, a Remittance for emergency services provided to Members under multiple procedure codes, including the following for CPT Codes 99284 and 99285:

d.    Member #17 was treated on May 14, 2019 at a billed charge of $1,428.00 (CPT Code 99285), for which Defendants, via Data iSight, allowed $435.20.

e.    Member #18 was treated on May 18, 2019, at a billed charge of $1,428.00 (CPT Code 99285), for which Defendants, via Data iSight, allowed $435.20.

f.    Yet, Member #19 was treated on March 25, 2019, at a billed charge of $973.00 (CPT Code 99285), for which Defendants, via MultiPlan, allowed $875.00 which is 90% of billed charges.  This a reasonable rate, in line with the reasonable rates historically paid by Defendants to Fremont for non-participating provider services.

g.    Further, for professional services provided by Team Physicians between January and June 2019, Defendants allowed and approved payments ranging from $294.60 (27% of billed charges in the amount of $1,084.00) up to 100%, or $1,084.00.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

185.    Defendants and Data iSight expected that those unreasonable payments would be accepted in full satisfaction of the Health Care Providers' claims.

186.    Defendants and Data iSight have received, and continue to receive, financial gains from their scheme to defraud the Health Care Providers.

187.    For the services that the Health Care Providers provided to Defendants' Members in 2019, only 13% of the non-participating claims have, to date, been reimbursed at reasonable rates, resulting in millions of dollars in financial loss to the Health Care Providers.

188.    The purpose of, and the direct and proximate result of the above-alleged Enterprise and scheme was, and continues to be, to unlawfully reimburse the Health Care Providers at unreasonable rates, to the harm of the Health Care Providers, and to the benefit of the Enterprise.

## FIRST CLAIM FOR RELIEF

### (Breach of Implied-in-Fact Contract)

189.    The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

190.    At all material times, the Health Care Providers were obligated under federal and Nevada law to provide emergency medicine services to all patients presenting at the emergency departments they staff, including Defendants' Patients.

191.    At all material times, Defendants were obligated to provide coverage for emergency medicine services to all of its Members.

192.    At all material times, Defendants knew that the Health Care Providers were non-participating emergency medicine groups that provided emergency medicine services to Patients.

193.    From July 1, 2017 to the present, Fremont has undertaken to provide emergency medicine services to UH Parties' Patients, and the UH Parties have undertaken to pay for such services provided to UH Parties' Patients.  And from prior to May 2015 to the present, Team Physicians and Ruby Crest have undertaken to provide emergency medicine services to UH

Parties' Patients, and the UH Parties have undertaken to pay for such services provided to UH Parties' Patients.

194.   From approximately March 1, 2019 to the present Fremont has undertaken to provide emergency medicine services to the Sierra Affiliates' and HPN's Patients, and Sierra Affiliates and HPN have undertaken to pay for such services provided to their Patients.  And from prior to May 2015 to the present, Team Physicians and Ruby Crest have undertaken to provide emergency medicine services to Sierra Affiliates' and HPN's Patients, and Sierra Affiliates and HPN have undertaken to pay for such services provided to their Patients.

195.   At all material times, Defendants were aware that the Health Care Providers were entitled to and expected to be paid at rates in accordance with the standards established under Nevada law.

196.   At all material times, Defendants have received the Health Care Providers' bills for the emergency medicine services the Health Care Providers have provided and continue to provide to Defendants' Patients, and Defendants have consistently adjudicated and paid, and continue to adjudicate and pay, the Health Care Providers directly for the non-participating claims, albeit at amounts less than usual and customary.

197.   Through the parties' conduct and respective undertaking of obligations concerning emergency medicine services provided by the Health Care Providers to Defendants' Patients, the parties implicitly agreed, and the Health Care Providers had a reasonable expectation and understanding, that Defendants would reimburse the Health Care Providers for non-participating claims at rates in accordance with the standards acceptable under Nevada law and in accordance with rates Defendants pay for other substantially identical claims also submitted by the Health Care Providers.

198.   Under Nevada common law, including the doctrine of quantum meruit, the Defendants, by undertaking responsibility for payment to the Health Care Providers for the services rendered to Defendants' Patients, impliedly agreed to reimburse the Health Care Providers at rates, at a minimum, equivalent to the reasonable value of the professional emergency medical services provided by the Health Care Providers.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

199. Defendants, by undertaking responsibility for payment to the Health Care Providers for the services rendered to the Defendants' Patients, impliedly agreed to reimburse the Health Care Providers at rates, at a minimum, equivalent to the usual and customary rate or alternatively for the reasonable value of the professional emergency medical services provided by the Health Care Providers.

200. In breach of its implied contract with the Health Care Providers, Defendants have and continue to unreasonably and systemically adjudicate the non-participating claims at rates substantially below both the usual and customary fees in the geographic area and the reasonable value of the professional emergency medical services provided by the Health Care Providers to the Defendants' Patients.

201. The Health Care Providers have performed all obligations under the implied contract with the Defendants concerning emergency medical services to be performed for Patients.

202. At all material times, all conditions precedent have occurred that were necessary for Defendants to perform their obligations under their implied contract to pay the Health Care Providers for the non-participating claims, at a minimum, based upon the "usual and customary fees in that locality" or the reasonable value of the Health Care Providers' professional emergency medicine services

203. The Health Care Providers did not agree that the lower reimbursement rates paid by Defendants were reasonable or sufficient to compensate the Health Care Providers for the emergency medical services provided to Patients.

204. The Health Care Providers have suffered damages in an amount equal to the difference between the amounts paid by Defendants and the usual and customary fees professional emergency medicine services in the same locality, that remain unpaid by Defendants through the date of trial, plus the Health Care Providers' loss of use of that money; or in an amount equal to the difference between the amounts paid by Defendants and the reasonable value of their professional emergency medicine services, that remain unpaid by the Defendants through the date of trial, plus the Health Care Providers' loss of use of that money.

205.    As a result of the Defendants' breach of the implied contract to pay the Health Care Providers for the non-participating claims at the rates required by Nevada law, the Health Care Providers have suffered injury and is entitled to monetary damages from Defendants to compensate them for that injury in an amount in excess of $15,000.00, exclusive of interest, costs and attorneys' fees, the exact amount of which will be proven at the time of trial.

206.    The Health Care Providers have been forced to retain counsel to prosecute this action and is entitled to receive their costs and attorneys' fees incurred herein.

## SECOND CLAIM FOR RELIEF

### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)

207.    The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

208.    The Health Care Providers and Defendants had a valid implied-in-fact contract as alleged herein.

209.    A special element of reliance or trust between the Health Care Providers and the Defendants, such that, Defendants were in a superior or entrusted position of knowledge.

210.    That the Health Care Providers performed all or substantially all of their obligations pursuant to the implied-in-fact contract.

211.    By paying substantially low rates that did not reasonably compensate the Health Care Providers the usual and customary rate or alternatively for the reasonable value of the services provide, Defendants performed in a manner that was unfaithful to the purpose of the implied-in-fact contract, or deliberately contravened the intention and sprit of the contract.

212.    That Defendants' conduct was a substantial factor in causing damage to Fremont.

213.    As a result of Defendants' tortious breach of the implied covenant of good faith and fair dealing, the Health Care Providers have suffered injury and is entitled to monetary damages from Defendants to compensate them for that injury in an amount in excess of $15,000.00, exclusive of interest, costs and attorneys' fees, the exact amount of which will be proven at the time of trial.

214. The acts and omissions of Defendants as alleged herein were attended by circumstances of malice, oppression and/or fraud, thereby justifying an award of punitive or exemplary damages in an amount to be proven at trial.

215. The Health Care Providers have been forced to retain counsel to prosecute this action and is entitled to receive their costs and attorneys' fees incurred herein.

### THIRD CLAIM FOR RELIEF

### (Alternative Claim for Unjust Enrichment)

216. The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

217. The Health Care Providers rendered valuable emergency services to the Patients.

218. Defendants received the benefit of having their healthcare obligations to their plan members discharged and their members received the benefit of the emergency care provided to them by the Health Care Providers.

219. As insurers or plan administrators, Defendants were reasonably notified that emergency medicine service providers such as the Health Care Providers would expect to be paid by Defendants for the emergency services provided to Patients.

220. Defendants accepted and retained the benefit of the services provided by the Health Care Providers at the request of the members of its Health Plans, knowing that the Health Care Providers expected to be paid a usual and customary fee based on locality, or alternatively for the reasonable value of services provided, for the medically necessary, covered emergency medicine services it performed for Defendants' Patients.

221. Defendants have received a benefit from the Health Care Providers' provision of services to its Patients and the resulting discharge of their healthcare obligations owed to their Patients.

222. Under the circumstances set forth above, it is unjust and inequitable for Defendants to retain the benefit they received without paying the value of that benefit; i.e., by paying the Health Care Providers at usual and customary rates, or alternatively for the reasonable value of services provided, for the claims that are the subject of this action and for all

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

emergency medicine services that the Health Care Providers will continue to provide to Defendants' Members.

223.    The Health Care Providers seek compensatory damages in an amount which will continue to accrue through the date of trial as a result of Defendants' continuing unjust enrichment.

224.    As a result of the Defendants' actions, the Health Care Providers have been damaged in an amount in excess of $15,000.00, exclusive of interest, costs and attorneys' fees, the exact amount of which will be proven at the time of trial.

225.    The Health Care Providers sue for the damages caused by the Defendants' conduct and is entitled to recover the difference between the amount the Defendants' paid for emergency care the Health Care Providers rendered to its members and the reasonable value of the service that the Health Care Providers rendered to Defendants by discharging their obligations to their plan members.

226.    As a direct result of the Defendants' acts and omissions complained of herein, it has been necessary for the Health Care Providers to retain legal counsel and others to prosecute their claims.  The Health Care Providers are thus entitled to an award of attorneys' fees and costs of suit incurred herein.

### FOURTH CLAIM FOR RELIEF

### (Violation of NRS 686A.020 and 686A.310)

227.    The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

228.    The Nevada Insurance Code prohibits an insurer from engaging in an unfair settlement practices.  NRS 686A.020, 686A.310.

229.    One prohibited unfair claim settlement practice is "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear." NRS 686A.310(1)(e).

230.    As detailed above, Defendants have failed to comply with NRS 686A.310(1)(e) by failing to pay the Health Care Providers' medical professionals the usual and customary rate

McDONALD ⚘ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

for emergency care provided to Defendants' members. By failing to pay the Health Care Providers' medical professionals the usual and customary rate Defendants have violated NRS 686A.310(1)(e) and committed an unfair settlement practice.

231. The Health Care Providers are therefore entitled to recover the difference between the amount Defendants paid for emergency care the Health Care Providers rendered to their members and the usual and customary rate, plus court costs and attorneys' fees.

232. The Health Care Providers are entitled to damages in an amount in excess of $15,000.00, exclusive of interest, costs and attorneys' fees, the exact amount of which will be proven at the time of trial.

233. Defendants have acted in bad faith regarding their obligation to pay the usual and customary fee; therefore, the Health Care Providers are entitled to recover punitive damages against Defendants.

234. As a direct result of Defendants' acts and omissions complained of herein, it has been necessary for the Health Care Providers to retain legal counsel and others to prosecute their claims. The Health Care Providers are thus entitled to an award of attorneys' fees and costs of suit incurred herein.

## FIFTH CLAIM FOR RELIEF

### (Violations of Nevada Prompt Pay Statutes & Regulations)

235. The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

236. The Nevada Insurance Code requires an HMO, MCO or other health insurer to pay a healthcare provider's claim within 30 days of receipt of a claim. NRS 683A.0879 (third party administrator), NRS 689A.410 (Individual Health Insurance), NRS 689B.255 (Group and Blanket Health Insurance), NRS 689C.485 (Health Insurance for Small Employers), NRS 695C.185 (HMO), NAC 686A.675 (all insurers) (collectively, the "NV Prompt Pay Laws"). Thus, for all submitted claims, Defendants were obligated to pay the Health Care Providers the usual and customary rate within 30 days of receipt of the claim.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

237.     Despite this obligation, as alleged herein, Defendants have failed to reimburse the Health Care Providers at the usual and customary rate within 30 days of the submission of the claim.   Indeed, Defendants failed to reimburse the Health Care Providers at the usual and customary rate at all.  Because Defendants have failed to reimburse the Health Care Providers at the usual and customary rate within 30 days of submission of the claims as the Nevada Insurance Code requires, Defendants are liable to the Health Care Providers for statutory penalties.

238.     For all claims payable by plans that Defendants insure wherein it failed to pay at the usual and customary fee within 30 days, Defendants are liable to the Health Care Providers for penalties as provided for in the Nevada Insurance Code.

239.     Additionally, Defendants have violated NV Prompt Pay Laws, by among things, only paying part of the subject claims that have been approved and are fully payable.

240.     The Health Care Providers seek penalties payable to it for late-paid and partially paid claims under the NV Prompt Pay Laws.

241.     The Health Care Providers are entitled to damages in an amount in excess of $15,000.00 to be determined at trial, including for its loss of the use of the money and its attorneys' fees.

242.      Under the Nevada Insurance Code and NV Prompt Pay Laws, the Health Care Providers are also entitled to recover their reasonable attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF

### (Consumer Fraud & Deceptive Trade Practices Acts)

243.     The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

244.     The Nevada Deceptive Trade Practices Act (DTPA) prohibits the UH Parties from engaging in "deceptive trade practices," including but not limited to (1) knowingly making a false representation in a transaction; (2) violating "a state or federal statute or regulation relating to the sale or lease of goods or services"; (3) using "coercion, duress or intimidation in a

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

transaction"; and (4) knowingly misrepresent the "legal rights, obligations or remedies of a party to a transaction."  NRS 598.0915(15), 598.0923(3), 598.0923(4), NRS 598.092(8), respectively.

245.    The Nevada Consumer Fraud Statute provides that a legal action "may be brought by any person who is a victim of consumer fraud." NRS 41.600(1). "Consumer fraud" includes a deceptive trade practice as defined by the DTPA.

246.    Defendants have violated the DTPA and the Consumer Fraud Statute through their acts, practices, and omissions described above, including but not limited to (a) wrongfully refusing to pay the Health Care Providers for the medically necessary, covered emergency services the Health Care Providers provided to Members in order to gain unfair leverage against the Health Care Providers now that they are out-of-network and in contract negotiations to potentially become a participating provider under a new contract in an effort to force the Health Care Providers to accept lower amounts than it is entitled for its services; and (b) engaging in systematic efforts to delay adjudication and payment of the Health Care Providers' claims for its services provided to UH Parties' members in violation of their legal obligations

247.    As a result of Defendants' violations of the DTPA and the Consumer Fraud Statute, the Health Care Providers are entitled to damages in an amount in excess of $15,000.00 to be determined at trial.

248.    Due to the willful and knowing engagement in deceptive trade practices, the Health Care Providers are entitled to recover treble damages and all profits derived from the knowing and willful violation.

249.    As a direct result of Defendants' acts and omissions complained of herein, it has been necessary for the Health Care Providers to retain legal counsel and others to prosecute their claims.  The Health Care Providers is thus entitled to an award of attorneys' fees and costs of suit incurred herein.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment)

250.    The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

251.   This is a claim for declaratory judgment and actual damages pursuant to NRS 30.010 *et seq.*

252.   As explained above, pursuant to federal and Nevada law, Defendants are required to cover and pay the Health Care Providers for the medically necessary, covered emergency medicine services the Health Care Providers have provided and continue to provide to Defendants' members.

253.   Under Nevada law, Defendants are required to pay the Health Care Providers the usual and customary rate for that emergency care.  Instead of reimbursing the Health Care Providers at the usual and customary rate or for the reasonable value of the professional medical services, Defendants have reimbursed them at reduced rates with no relation to the usual and customary rate.

254.   Beginning in or about July 2017, Fremont became out-of-network with the UH Parties; and Team Physicians and Ruby Crest have never been in-network with the UH Parties. Since then, the UH Parties have demonstrated their refusal to timely settle insurance claims submitted by the Health Care Providers and have failed to pay the usual and customary rate based on this locality in violation of UH Parties' obligations under the Nevada Insurance Code, the parties' implied-in-fact contract and pursuant to Nevada law of unjust enrichment and quantum merit.

255.   Beginning in or about March 2019, Fremont became out-of-network with the Sierra Affiliates and HPN and Physicians and Ruby Crest have never been in-network with the Sierra Affiliates or HPN.  Upon information and belief, the Sierra Affiliates and HPN are failing to timely settle insurance claims submitted by the Health Care Providers and to pay the usual and customary rate based on this locality in violation of the Sierra Affiliates' and HPN's obligations under the Nevada Insurance Code, the parties' implied-in-fact contract and pursuant to Nevada law of unjust enrichment and quantum merit.

256.   An actual, justiciable controversy therefore exists between the parties regarding the rate of payment for the Health Care Providers' emergency care that is the usual and customary rate that Defendants are obligated to pay.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

257.   Pursuant to NRS 30.040 and 30.050, the Health Care Providers therefore request a declaration establishing the usual and customary rates that they are entitled to receive for claims between July 1, 2017 and trial, as well as a declaration that the UH Parties are required to pay to the Health Care Providers at a usual and customary rate for claims submitted thereafter.

258.   Pursuant to NRS 30.040 and 30.050, Team Physicians and Ruby Crest therefore request a declaration establishing the usual and customary rates that they are entitled to receive for claims between July 1, 2017 and trial, as well as a declaration that the Sierra Affiliates and HPN are required to pay to Team Physicians and Ruby Crest at a usual and customary rate for claims submitted thereafter.

259.   Pursuant to NRS 30.040 and 30.050, Fremont therefore request a declaration establishing the usual and customary rates that Fremont is entitled to receive for claims between March 1, 2019 and trial, as well as a declaration that the Sierra Affiliates and HPN are required to pay to Fremont at a usual and customary rate for claims submitted thereafter.

260.   As a direct result of Defendants' acts and omissions complained of herein, it has been necessary for the Health Care Providers to retain legal counsel and others to prosecute their claims.  The Health Care Providers are thus entitled to an award of attorneys' fees and costs of suit incurred herein.

## EIGHTH CLAIM FOR RELIEF

### (Violation of NRS 207.350 *et seq.*)

261.   The Health Care Providers incorporate herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

262.   Nevada RICO allows a private cause of action for racketeering.  NRS 207.470 provides in pertinent part that:

> Any person who is injured in his or her business or property by reason of any violation of NRS 207.400 has a cause of action against a person causing such injury for three times the actual damages sustained. An injured person may also recover attorney's fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.

263.   This claim arises under NRS 207.400(b), (c), (d) and (j).

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

264.    The Defendants committed the following crimes of racketeering activity:  NRS 207.360(28) (obtaining possession of money or property valued at $650 or more), NRS 207.360(35) (any violation of NRS 205.377), and NRS 207.360(36) (involuntary servitude).

265.    The Defendants engaged in racketeering enterprises as defined by NRS 207.380 involving their fraudulent misrepresentations to the Health Care Providers, and failing to pay and retaining significant sums of money that should have been paid to them for emergency medicine services provided to the Defendants' Members, but instead were directed to themselves and/or Data iSight.

266.    As set forth above, since at least January 2019, Defendants have been and continue to be, a part of an association-in-fact enterprise within the meaning of NRS 207.380, comprised of at least Defendants and Data iSight, and which Enterprise was and is engaged in activities that span multiple states and affect interstate commerce and/or committed preparatory acts in furtherance thereof.

267.    Each of the Defendants has an existence separate and distinct from the Enterprise, in addition to directly participating and acting as a part of the Enterprise.

268.    Defendants and Data iSight had, and continue to have, the common and continuing purpose of dramatically reducing allowed provider reimbursement rates for their own pecuniary gain, by defrauding the Health Care Providers and preventing them from obtaining reasonable payment for the services they provided to Defendants' Members, in retaliation for the Health Care Providers' lawful refusal to agree to Defendants' massively discounted and unreasonable proposed contractual rates.

269.    Since at least January 2019, the Defendants, have been and continue to be, engaged in preparations and implementation of a scheme to defraud the Health Care Providers by committing a series of unlawful acts designed to obtain a financial benefit by means of false or fraudulent pretenses, representations, promises or material omissions which constitute predicate unlawful activity under NRS 207.390 involving multiple instances of  obtaining possession of money or property valued at $650 or more; multiple transactions involving fraud or deceit in course of enterprise or occupation and involuntary servitude in violation of NRS

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

200.463.  The Defendants have engaged in more than two related and continuous acts amounting to racketeering activity in violation of NRS 207.400(1)(a)-(d), (1)(f), (1)(h)-(i) pursuant to a scheme or artifice to defraud and to which the Defendants have committed for financial benefit and gain to the detriment of the Health Care Providers. The Defendants, on more than two occasions, have schemed with Data iSight to artificially and, without foundation, substantially decrease non-participating provider reimbursement rates while continuing to represent that the reimbursement rates are based on legitimate cost data or paid data.

270.    The foregoing acts establish racketeering activity and are related to each other in that they further the joint goal of unfairly and illegally retaining financial benefit to the detriment of the Health Care Providers.  In each of the examples provided herein, the acts alleged to establish a pattern of unlawful activity are related because they have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

271.    Each Defendant provides benefits to insured members, processes claims for services provided to members, and/or issues payments for services and knows and willingly participates in the scheme to defraud the Health Care Providers.

272.    As a direct and proximate result of Defendants' violations of NRS 207.360(28), (35) and (36), the Health Care Providers have sustained a reasonably foreseeable injury in their business or property by a pattern of racketeering activity, suffering substantial financial losses, in an amount to be proven at trial, in violation of NRS 207.470.

273.    Pursuant to NRS 207.470, the Health Care Providers are entitled to damages for three times the actual damages sustained, recovery of attorneys' fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.

### REQUEST FOR RELIEF

WHEREFORE, the Health Care Providers request the following relief:

A.    For awards of general and special damages in amounts in excess of $15,000.00, the exact amounts of which will be proven at trial;

B.    Judgment in their favor on the First Amended Complaint;

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

C.      Awards of actual, consequential, general, and special damages in an amount in excess of $15,000.00, the exact amounts of which will be proven at trial;

D.      An award of punitive damages, the exact amount of which will be proven at trial;

E.      A declaratory judgment that Defendants' failure to pay the Health Care Providers a usual and customary fee or rate for this locality or alternatively, for the reasonable value of their services violates the Nevada law, breaches the parties' implied-in-fact contract, is a tortious breach of the implied covenant of good faith and fair dealing, and violates Nevada common law;

F.      An order permanently enjoining Defendants from paying rates that do not represent usual and customary fees or rates for this locality or alternatively, that do not compensate the Health Care Providers for the reasonable value of their services; and enjoining Defendants and enjoining Defendants from engaging in acts or omissions that are violative of Nevada law;

G.      Judgment against the Defendants and in favor of the Health Care Providers pursuant to the Eighth Claim for Relief in an amount constituting treble damages resulting from Defendants' underpayments to the Health Care Providers for the reasonable value of the emergency services provided to Defendants' Members and reasonable attorneys' fees and costs incurred in bringing this action;

H.      The Health Care Providers costs and reasonable attorneys' fees pursuant to NRS 207.470;

I.      Reasonable attorneys' fees and court costs;

J.      Pre-judgment and post-judgment interest at the highest rates permitted by law; and

K.      Such other and further relief as the Court may deem just and proper.

…

…

…

…

…

**JURY DEMAND**

The Health Care Providers hereby demand trial by jury on all issues so triable.

DATED this 7th day of January, 2020.

McDONALD CARANO LLP

By: /s/  *Pat Lundvall*
Pat Lundvall (NSBN 3761)
Kristen T. Gallagher (NSBN 9561)
Amanda M. Perach (NSBN 12399)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
plundvall@mcdonaldcarano.com
kgallagher@mcdonaldcarano.com
aperach@mcdonaldcarano.com

*Attorneys for Plaintiffs Fremont Emergency Services (Mandavia), Ltd., Team Physicians of Nevada-Mandavia, P.C. & Crum, Stefanko and Jones, Ltd. dba Ruby Crest Emergency Medicine*

1

**CERTIFICATE OF SERVICE**

2       I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on this

3   7th day of January, 2020, I caused a true and correct copy of the foregoing **FIRST AMENDED**

4   **COMPLAINT** to be served via the U.S. District Court's Notice of Electronic Filing system

5   ("NEF") in the above-captioned case, upon the following:

6

7       D. Lee Roberts, Jr., Esq.
        Colby L. Balkenbush, Esq.
        Josephine E. Groh, Esq.

8       WEINBERG, WHEELER, HUDGINS,
        GUNN & DIAL, LLC

9       6385 South Rainbow Blvd., Suite 400
        Las Vegas, Nevada 89118

10      Telephone: (702) 938-3838
        lroberts@wwhgd.corn

11      cbalkenbush@wwhgd.corn
        jgroh@wwhgdcorn

12

13      *Attorneys for Defendants UnitedHealthcare*
        *Insurance Company, United HealthCare*
        *Services, Inc., UMR, Inc., Oxford Health Plans*

14      *Inc., Sierra Health and Life Insurance Co.,*
        *Inc., Sierra Health-Care Options, Inc., and*

15      *Health Plan of Nevada, Inc.*

16

17      /s/   *Marianne Carter*
        An employee of McDonald Carano LLP

18

19

20

21

22

23

24

25

26

27

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966